Gary Steven **KRIST**, Petitioner,

v.

**S. Lamont SMITH, Warden, Georgia State Prison, Reidsville, Georgia,**
Respondent.

No. 2549.

United States District Court,
S. D. Georgia,
Savannah Division.

Feb. 13, 1970.

Supplemental and Final Order
Feb. 25, 1970.

Gary Steven Krist, pro se.

William R. Childers, Jr., Deputy Asst. Atty. Gen., Atlanta, Ga., for respondent.

## ORDER

LAWRENCE, Chief Judge.

In December, 1968, Gary Steven Krist abducted Miss Barbara Jane Mackle for ransom and buried her alive for eighty hours in a wooden box equipped with such amenities of living as an air pump and two vents, a battery-powered light and some food and water. Sentenced to life imprisonment after his conviction for kidnapping, he comes to the District Court complaining of the minuteness of his cell, the loneliness of life under maximum security conditions, the food served at Georgia State Prison and other objectionable conditions there.

Asserting that he is being cruelly, unusually and "sub-humanly" punished by solitary confinement, Petitioner seeks injunctive relief under the Eighth and Fourteenth Amendments and under the Civil Rights Act, 42 U.S.C. § 1983. In a similar action in the State courts relief was denied Krist on the ground that prison administration is not a judicial function. Recently Petitioner voluntarily dismissed the appeal from that ruling which was pending in the Supreme Court of Georgia.

The complaints about Krist's life in prison make the Book of Lamentations sound like a paean of thanksgiving.[1] He objects to practically everything connected with his imprisonment. His quarters, 9 feet x 5 feet, are too cramped. He complains that he "rots in his concrete Georgia garbage can." There is no window in his cell at Reidsville Gaol and he cannot look even with a "wistful eye at that little tent of blue which prisoners call the sky." A "gregarious" person, or so he characterizes himself, the only cellmates he has are roaches. His quarters contain only a bed, a table, a basin, shelf and a commode. He is supplied nothing except Bon Ami to cleanse the latter. Food is passed to him through an opening under the door. The food is terrible, the diet unbalanced. There are no fresh vegetables or fruit and far too much of a nauseous herb called turnip greens. He gets no exercise. He is restricted to two shower baths a week. He suffers from a scalp disorder and the right kind of shampoo is not available. There is no television and no movies. He cannot get books from the prison library without considerable trouble. He is not permitted to attend church services. The medical setup equally disenchants Krist. He complains that he did not get proper medication for an ear infection and that he received too much for a nervous condition in the form of tranquillizers dispensed by a non-licensed prison techni-

---

1. "He hath set me in dark places * * He hath hedged me about, that I cannot get out; he hath made my chain heavy. Also when I cry and shout, he shutteth off my prayer. He hath enclosed my ways with hewn stone * * he hath made me desolate * * * He hath filled me with bitterness, he hath made me drunken with wormwood * * They have cut off my life in the dungeon * * *."

cian. No doctor is available at night. Furthermore, the physicians do not speak English.

Petitioner represented himself at the evidentiary hearing.[2] His principal point is that the solitary confinement imposed on him is arbitrary and capricious and that maximum security is, in his case, in itself a punishment, which is not merited by his conduct in the prison.[3] He says that his life sentence has been modified to a *de facto* sentence of "life imprisonment in solitary confinement." He argues that prolonged confinement in isolation without physical activity can produce ulcers, muscle atrophy, nervous disorders, pulmonary embolism, hypertension, excessive weight gain, etc. He introduced as exhibits results of research in space and undersea experiments as to humans in relation to the effect of isolation and inactivity. He claims that he has suffered physical effects from enforced idleness and segregation. I permitted Petitioner to submit interrogatories to two inmates. They agreed as to the adverse physical effects of prolonged segregated confinement.

The maximum security wing of the Reidsville prison houses around 200 inmates. Confinement there is called administrative segregation. It differs from disciplinary segregation which involves solitary confinement where a prisoner receives one meal a day and has no bed. When Krist first entered the prison he was classified by the Warden as a member of the general inmate population and was assigned for a time to a detail that worked outside the prison under armed guard. Subsequently, on July 15, 1969, Wallace Lambert, Associate Director of the State Board of Corrections, for the reasons later set forth in this opinion ordered the Warden to change the classification to that of maximum security.

At this point an examination of the jurisdiction and powers of federal courts to interfere in the operation of a state prison system is appropriate. Where a prisoner does not seek release from custody on petition for habeas corpus but complains of cruel or unusual punishment he may obtain relief in a proper case under the Civil Rights Act without prior application to or without exhaustion of remedies in the state courts. Hancock v. Avery, D.C., 301 F.Supp. 786.

However, administration of state detention facilities is a state function with which federal courts will not interfere except where paramount federal constitutional or statutory rights intervene. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; Hancock v. Avery, supra. Maintenance of discipline in prisons being an executive function, the judicial branch is loath to intrude. Jackson v. Godwin, 5 Cir., 400 F.2d 529; Beard v. Lee, 5 Cir., 396 F.2d 749. State prison officials are vested with wide discretion in controlling prisoners and their discretion will not be interfered with unless abused or arbitrarily or capriciously exercised. Graham v. Willingham, D.C., 265 F.Supp. 763; Rentfrow v. Carter, D.C., 296 F. Supp. 301; Courtney v. Bishop, 8 Cir., 409 F.2d 1185; Roy v. Wainwright, 5 Cir., 418 F.2d 231. Only in extreme cases do federal courts intervene in the conduct of a state prison or discipline of prisoners. Jones v. Peyton, D.C., 294 F.Supp. 173; Tabor v. Hardwick, 5 Cir., 224 F.2d 526; Jackson v. Godwin, *supra*. Solitary confinement is not in itself a cruel and unusual punishment (Kostal v. Tinsley, 10 Cir., 337 F.2d 845; Graham v. Willingham, *supra*) and the discretion of prison officials in that regard is ordinarily not subject to judicial review. Kostal v. Tinsley, *supra*. However, the rule is different where a substantive constitutional right is violated. Nolan v. Scafati, D.C., 306 F.Supp. 1. It has been held that in such a case that judicial in-

---

2. Quite ably, I will add.

3. It was conceded by Deputy Warden J. E. Thompson that the prisoner's conduct while in the State prison has been good.

terposition may extend to examination of maximum security conditions in state prisons in determining whether solitary confinement violates the Eighth Amendment. See Hancock v. Avery, *supra.*

In the last mentioned case District Judge Miller held that the treatment of the Petitioner was violative of the Eighth Amendment. He said that "the concept of cruel and unusual punishment is one of wide application capable of acquiring new depths of meaning to conform to more enlightened concepts of criminal justice." *ibid.*, 301 F.Supp. 791. Hancock was confined in a "dry cell" which lacked minimal sanitary conditions, was not permitted to wear clothing and slept on the concrete floor without a blanket. His existence was not unlike that of a caged animal.

■ The cell in which Krist is confined and the conditions of his isolation are radically different from what the prisoner experienced in Hancock v. Avery. However, Krist contends that solitary confinement is in itself a species of punishment and that it represents in his case an arbitrary modification of his life sentence to a harsher one. As stated above, solitary confinement is not *per se* an unconstitutional form of punishment. It is permissible where its object is protection of the general prison population or the personnel, protection of the prisoner himself, for disobedience of orders or for prevention of his escape. The latter theory is the reason for Krist being held in maximum security.

Was this a capricious and arbitrary determination on the part of Associate Director Lambert?

In an affidavit furnished by Mr. Lambert subsequent to the evidentiary hearing he stated that a thorough classification evaluation was conducted when Krist was confined at the Georgia Diagnostic and Classification Center.[4] The Committee "listed his security classification as 'MAXIMUM-Multiple Escapee'," based on "a history of three (3) escapes and

one (1) attempt to escape from out of state authorities." The Superintendent of the Center considered Krist "a high escape potential."

At the hearing Petitioner admitted to two of the escapes. He objected to any introduction in evidence of the escape from the Deuel Vocational Institution in California on the ground that he had never been indicted and tried for such escape. The objection was meritless but I ordered defendant to obtain a certified copy of Krist's escape prison record at Deuel. This was done. It appears that on November 11, 1966, Krist and a cellmate used a hacksaw blade to cut the bars of the window which they replaced after exiting, leaving dummies on their cots. They had fashioned wire cutters from metal strips which were bolted together but it was not necessary to use the instrument to cut the chain fence as they located a metal scaffold on wheels. A tower guard espied the two men as they pushed the scaffold to the inner security fence and threw a piece of lumber across same over to the outer fence. After a warning shot the guard fired several times at the escapees from a distance of 146 yards. One of the prisoners was killed. The other jumped clear of the outer fence and disappeared in the darkness. He was Krist. As an escapee from Deuel he committed the crime for which he is presently incarcerated in Georgia.

■ The escape record of Krist amply justifies the penal officials of this State in requiring maximum security for such a prisoner and one who is so dangerous when free. I decline to interfere with the discretion of the State Prison officials in this case. The last thing I intend to do is to set myself up as a board of appeals for the individual cases of hundreds of prisoners who complain of being placed in maximum security or the conditions of such imprisonment.

However, I am still confronted with the question of whether Petitioner's

---

4. The prisoner's objections to the reception of this or to any other post-hearing evidence, by affidavit or documentary, are overruled.

Eighth Amendment rights are being transgressed by the refusal to afford him any opportunity whatever for exercise. It may well be that to that extent the punishment is "cruel." The same issue recently came before Judge Miller of the Middle District of Tennessee who handed down the decision in Hancock v. Avery. The case involved a petition by James Earl Ray who is being held in solitary confinement. The Court did not hand down a formal opinion but according to the newspaper notices the prison authorities, at its direction, submitted a plan providing for an activity program which included a work schedule as well as time in the enclosed exercise yard. Judge Miller was quoted in the press as saying: "Enforced idleness can be a very real form of punishment."

I have already referred to the objections of Petitioner to the affidavit of Associate Director Lambert which was filed by Respondent on February 12th. I am confident that Mr. Krist was unaware of its serendipitous qualities. Mr. Lambert stated:

"Relative to the overall security of the institution a development will occur, in the near future, which will alter the status and type of confinement of certain inmates situated as is Gary Steven Krist.

"A Periguard system is presently being installed at Georgia State Prison which will radically increase the custody and security capability of the institution. This perimeter system when perfected will instantly alert the custodial staff in the event any inmate attempts escape above ground or by tunnel. Additionally the system will pinpoint the location of the attempted escape.

"When the Periguard system is operational, and perfected, Krist, and others similarly classified, can be re-assigned to other quarters though still classified as maximum security and not eligible for assignment to details which leave the compound proper or go outside the institutional perimeter."

Of course, we are uncertain when the "Periguard system" will become operational—three months, six months, a year —when? Meanwhile, the constitutional issue exists and persists. The statute creating the State Board of Corrections provides that such body "shall give the prisoners opportunity for reasonable educational, religious and recreational activities where practical." Ga.Code (Supp.) § 77–319. While the Board of Corrections is not a formal party to this litigation it may be willing to inquire into the reasons and inform the Court why it is impractical for maximum security prisoners to be taken out of their cells periodically for the purpose of exercise. Perhaps also the Board and the Attorney General of Georgia will be willing to enlighten the Court as to possible solutions for the Eighth Amendment questions and problems posed by this and similar cases.

Final judgment is reserved for a period of two weeks.

### SUPPLEMENTAL AND FINAL ORDER

Since my order dated February 13th the State Board of Corrections has informed me that the Periguard alarm system at Reidsville will be fully operative in April of this year.

At the evidentiary hearing on January 2, 1970, Deputy Warden Thompson testified that one of the reasons recreational opportunities are not afforded inmates assigned to administrative segregation is the lack of custodial personnel. The Georgia State Prison presently has an inmate population of 2,983 and a complement of 269 custodial officers, representing an approximate officer-inmate ratio of 1 to 11. The national average is 1 to 6.5.

Associate Director Lambert informs the Court:

"A. With the seventeen (17) new positions, available on July 1, 1970, additional custodial personnel will be available for assignment, at least as a part of their duties, to the administra-

tive segregation cell block to supervise inmates during periodic recreational periods.

B. A survey of existing manpower has already been planned for the near future. I have directed our Personnel Officer to advise me if the survey determines we can achieve better utilization of the present personnel and, if so, some officers who are removed from present duty assignments can be used to assist in the recreational program for administrative segregation.

C. The authorities at Georgia State Prison are to evaluate the present inmate cell assignments to classify these inmates in compatible groups so they may be exercised together. There will, of course, be certain inmates who will have to be exercised alone. In all probability there will be certain inmates who will refuse to participate in the recreational program.

D. I have instructed the Warden to direct his Classification Committee to review all administrative segregation cases, particularly protective custody cases, to determine if their present status permits a return to general population."

The prison authorities have shown that they are sensitive to the problem of recreation and display an awareness of the need of corrective measures. The completion of the alarm system in April will moot the main issues in this case. The right to be assigned to some sort of work, which Krist claims, addresses itself to the prison officials and not to this Court. The Board is quite capable of running prisons without help from me. Finding no abuse of discretion or arbitrariness in the assignment of Gary Steven Krist to administrative segregation or in the conditions of his confinement, the petition for injunctive relief is denied.